Our next case this morning are Sinclair Wyoming Refining v. A & B Builders, et al., 19-8042 and Sinclair Wyoming Refining v. Applied Control Equipment, et al., 19-8053. Counsel, you may proceed. Mr. Breslau. Thank you, Your Honor. Brad Breslau of Coles and O'Connor appearing on behalf of Plaintiff Appellant Sinclair. This matter comes before the court with Sinclair seeking reversal of multiple dispositive motions against all seven defendants as a result of an explosion that occurred at its refinery in September 2013. Sinclair also appeals the order entered by Magistrate Kelly Rankin, striking the addendum in Aradisheek to the testimony of James Eggleston. On September 27, 2013, a refinery owned and operated by Sinclair suffered a catastrophic explosion and fire in a portion of the refinery known as the No. 4 HDS unit caused by the instantaneous fracture of a 740-pound control valve. Now, the cause of this explosion is not in dispute. The control valve was manufactured from carbon steel and subject to high temperature, high pressure hydrogen. The valve was attacked over a period of time, microscopically and instantaneously fractured, causing a significant explosion and approximately $117 million in damage. By way of background, in 2004, Sinclair purchased a mothballed hydrocracker unit from a refinery known as the Powerine Refinery in Lakeland, California to add to its refinery in Wyoming. Because of Sinclair's small engineering and inspection department, its lack of expertise in areas of engineering and construction, and the fact that it was operating an existing refinery, it outsourced the engineering and construction activities associated with this unit to third parties and shifted responsibility for the proper engineering and construction of the No. 4 HDS unit to its contractors and vendors. As a result of this explosion, Sinclair brought claims against seven appellees, and I'll just briefly, with the court's permission, go through each of the parties so it has an understanding as to each and every one of them. Hal Baker Engineers entered into an EPC, Engineering Procurement and Construction contract with Sinclair for the detailed engineering, construction, and inspection associated with the removal of the refinery from California, and re-erection in Wyoming. Hal Baker immediately subcontracted 100% of that agreement to A&B Builders, which was a company that basically disassembled the unit in California, transported it to Wyoming, and re-erected it in Wyoming. Matrix was a subcontractor for the detailed engineering performed for the re-erected unit. Sinclair entered into an agreement with Applied Control Equipment, also referred to as ACE, with respect to the control valves that were in the unit moved from California to Wyoming. Applied Control along with IVS, another appellee, went out to Sinclair's facility refinery in Wyoming, viewed all of the control valves, and then was given a spreadsheet with the process conditions for each and every one of those control valves, and came back to- Excuse me, there was no secret that that valve was of carbon steel, it was stamped right on it. The valve that was supplied from the facility in California was a stainless steel valve, your honor. That didn't work, and they contracted to get this FV- 241. 241, and it was stamped right on the side of it, carbon steel. And Mr. Eggleton knew it. Well, that's not accurate, your honor. Mr. Eggleston was deposed and indicated that he believed that FV-241 was manufactured of carbon steel because he performed Brinell tests on that valve in 2009. Brinell tests leave marks on the valve that remain. Mr. Eggleston testified that he believes he made three indentations in four different locations. It turns out he was incorrect. He looked at FV-241 after his deposition, realized that he was incorrect about his knowledge, and then gave a second deposition explaining that. Well, that was stricken, was it not? And you did not appeal that to the district court. That's not correct, your honor. Judge Rankin struck the addenda and the errata sheets for the first deposition, but specifically did not address the second deposition and indicated in his order that that is an issue of fact for determination by the jury. Well, you did not appeal the striking of the attempt to change the deposition, did you? Well, your honor, no. You did not. We can't even see that. There was an order, a stay order issued by the district court judge that specifically indicated that no further filings would be made. And after that stay order entered, Magistrate Judge Rankin entered his order striking the errata sheets and addenda to the first deposition. But the stay was never lifted by the court, and we were prohibited from filing an objection to the magistrate's filing. So there's a significant issue as to whether Sinclair knew that this valve was carbon steel. When the unit was up and running, due to the temperature of the fluid running through the valve and the line, approximately 583 degrees Fahrenheit, the valve and the line were covered with insulation. So it would not typically be seen by anybody working in the refinery. In addition, Sinclair relied upon Hal Baker and its two subcontractors to make sure that the valve that was installed met their specifications, and it didn't. It was a carbon steel valve placed on a stainless steel line, and again, Sinclair outsourced this responsibility to them. And Hal Baker, A&B, and Matrix never caught this issue, and the valve was placed in the service. With respect to... Mr. Breslau, apart from Mr. Eggleston's deposition, the issues surrounding that, didn't Mr. Burns from ACE send Sinclair's, Mr. Edwards' quotation that described the FV241 as made from carbon steel? Why wouldn't that have put Sinclair on notice that it was getting a carbon steel valve? Well, the specification sheet which was provided was to have been the best recommendation made by Applied Control Equipment with the assistance of IBS with respect to the correct control valve for that application. Sinclair had given the control valve from the powering facility to IBS and ACE to review. It was the same, they were subject to the exact same conditions as the FV241, and it came back as a valve that should be manufactured out of carbon steel. Again, Your Honor, these are issues of fact which a jury should consider as opposed to the court determining as a matter of law that Sinclair knew that this was a carbon steel valve. But in any event, the process conditions were given to ACE and were given to IBS. They came back with a recommendation for a carbon steel valve. Remember, Sinclair didn't have the expertise in-house and were outsourcing this to entities that they believed were experts in these areas. In fact, they adopted a belt and suspenders type approach. They had Applied and IBS make their best recommendation for a valve, and then they had Hal Baker Matrix in A and B in place to make sure that valve met their specifications, and it didn't. So these are all issues of fact which the court disregarded and which should be submitted to a jury. With respect to the claims that were made by Sinclair, I'd like to address the court's motion to dismiss the second and third claims for relief that we filed against Hal Baker A and B in Matrix. These were both negligence claims, and the court made a determination that there were no independent tort claims because of the contract entered into between Sinclair and Hal Baker. Alternatively, the court determined that under Section 1.7 of the EPC contract, Sinclair waived its all claims and negligence claims and all claims for damages. With respect to the independent duty argument, Your Honor, Wyoming law recognizes independent tort duties in commercial contracts such as this, and we cite the court to Klein v. Sawyer. In the Excel case in 2010, the court again recognized in the commercial construction case that tort liability may be premised on a duty separate and apart from a contractual duty. In the case of FB 241, which is an American Petroleum Institute authoritative industry standard, which indicated that FB 241 should have been manufactured out of stainless steel instead of carbon steel. Mr. Breslov, before you get too much further, I need to kind of just back up about 30 seconds and make sure I'm understanding what you're saying. Let me ask the question this way. On the negligence claims and the independent duty issue, why doesn't Article 1.7 in the EPC, by disclaiming implied warranties, how would that allow for recognition of an independent tort duty for Hal Baker to avoid construction defects, given that language in Article 1.7? And as indicated earlier, Hal Baker subcontracted 100% of its work to A and B in Matrix. Further, if you look at the language of 1.7, it only applies to Article 1 of Part 3, which is the guarantee warranty provision. And if you follow Judge Johnson's analysis, he interprets that to basically waive all negligence claims and all damage claims because the only relief that is allowed by 1.7 is a correction, repair, or replacement of defective materials or equipment. Now, we would respectfully suggest that Judge Johnson read this section in isolation. Because if you look at the remainder of the contract, it is crystal clear that it contemplates negligence claims by Sinclair, and I'm referring to Article 28.1.4, Article 28.4, and Articles 50 and 51. Because they specifically reference the negligence of Hal Baker as being considered by the contract. Now, if the court has thrown out the negligence claims under 1.7, how do you ever reach a negligence claim as referred to in the remainder of the contract? Wasn't the court also relying on the limitations arising from the economic loss rule? I don't believe so. The economic loss rule is not applicable because of the fact that there was property damage which was sought in this matter. And it's in the amount of practically $48 million, Your Honor. Did Sinclair agree to waive any claims not agreed to in the EPC contract? No. Article 1.7, as I indicated, is limited to defects under the warranty provision of Article 1 found within 12 months. And further, if you follow Judge Johnson's analysis on 1.7, you couldn't have a damage claim. And if you look at the contract, specifically Articles 50 and 51, and Article 28, they specifically reference damage claims by Sinclair. So by the court ruling that 1.7 is a broad waiver exculpation of Hal Baker, it renders the remainder of the contract or those other provisions meaningless. Again, it only applies to Hal Baker as a contractor if you read that section. It does not apply to A and B or Matrix. If I may go on, with respect to the 12-month period, the court ruled that Sinclair's breach of contract claim was barred by a 12-month period contained in 1.7. 1.7 does not address breach of contract claims. It only references tort claims. In addition, Sinclair's breaches of contract, which inserts a total of 32 and only one falls in within that Article 1 section. Counsel, doesn't that section say that Article 1 sets out Sinclair's exclusive recourse for the quality of the work and release Hal Baker from liability in excess thereof? Why doesn't that define what Sinclair's recourse is and that's it? Well, first of all, it only applies to Hal Baker. Secondly, the paragraph only addresses warranties. And again, Your Honor, if this is correct, how do you get to the negligence issues that are referenced later on in the contract or the damage issues that are referenced later on? But as far as a breach of contract claim goes, why doesn't Article 1 define what Sinclair can and cannot do? Because there are multiple representations made in the contract outside of this Article 1 that Sinclair claims were breached. For example, the duty to inspect material provided by Ace to the project to make sure it complies with their own specifications. Are we talking about which defendants are we talking about right now? Now you're mentioning Ace and before we were with Hal Baker. So can you just, is the answer different for different defendants? It absolutely is, Your Honor, because this Section 1.7 only applies to Hal Baker. It only applies to the contractor. It doesn't apply to subcontractors. And contractor is defined on the first page of the contract as being Hal Baker. And that's a distinction that the court never recognized in its order. We made that argument initially. We made it under motion for reconsideration. The court never addressed it. I should also indicate, Your Honor, that this Section 1.7 was not raised by Hal Baker, A and B, or Matrix in their motion to dismiss Sinclair's negligence claim. It was determined by the court sua sponte in its order that it was applicable. One would think that Hal Baker, Matrix, and A and B would understand their contract and would have made that argument if that, in fact, was the case. Now certainly they glommed on to that after the court had ruled. But as indicated, it's a limited paragraph that only applies to Hal Baker, does not apply to A and B or Matrix, and is inconsistent with the portions of the contract that deal with negligence of the party, because the court has thrown out the negligence claims. And how do you ever reach those issues? And it's also inconsistent with the damage claims and limitations that are set forth. Because if you read this article, the only recourse Sinclair has is a correction, repair, or replacement of defective products. So, counsel, could I ask you about the indemnity issue? This is the counterclaim for indemnity. And I take one of your arguments is that the issue was abandoned because a counterclaim was not reasserted or repled in response to the amended complaints. Is that part of your argument? That is part of the argument, Your Honor. So here's my question. Could you help us through the federal rules of civil procedure in that regard? Where do the rules say that a counterclaim must be repled in response to an amended complaint? Well, Your Honor, it's a compulsory counterclaim. And it was abandoned. It was asserted. I'm sorry? It was asserted. It was asserted. There's no indication it was abandoned. Well, it was asserted, Your Honor, in response to the initial complaint. It was not asserted in response to the first amended complaint. Well, that's the question. Does it have to be? Well, as indicated in our brief, we do contend that it was abandoned and it should have been asserted. I mean, the court considered that a minor procedural issue and basically said, well, they asserted an affirmative defense of release, so we should have known about identification. But what I'm what I'm looking for is it's abandoned because federal rule of civil procedure X says it was abandoned. Is there anything we can grab onto to agree with your position? None other than the case law cited in the brief, Your Honor. All right. So one other question on this, which is you argue that the district court's consideration and resolution of the counterclaim issue because it wasn't replayed prejudiced Sinclair. How was Sinclair prejudiced? Because it performed no discovery on the identification issue. All right. So that that really leads me to my main question here. It seems as though the arguments on the merits on this involve a rather involved discussion of the provisions in Article 28. But I'm not seeing how discovery is would would would be making that much of a difference. What if you had had an opportunity for discovery, what would you have tried to discover? Well, Your Honor, the as indicated in the brief, the language in Article 28 is all over the place. And what what we would have attempted to do is question individuals from how Baker with respect to the intent of the language is clearly ambiguous. It's in conflict. And as indicated, Judge Judge Johnson's analysis of that with respect to Section twenty eight point three point one and twenty eight point three point four really makes very little sense. But importantly, Your Honor, the issue of whether there was a breach of this contract by Sinclair is a issue of fact that should have gone to the jury. I mean, Sinclair basically was a passive party here. All the work was done by CV and I or how Baker Matrix and A and B and and the failure to perform a PSSR, which is how the court got to the issue of breach. What is the responsibility of how Baker Matrix and A and B and the requirement for PSSR is a requirement between the employer, which is Sinclair here in OSHA. And it's not something that ignores to tell Baker, Your Honor, I feel I only have. Well, didn't Sinclair's project manager testify that Sinclair did not perform the PSSR? He yeah, they relied upon CB and I, how Baker Matrix and A and B to do the work for them. And that's their responsibility that they didn't fill. Well, but that's a responsibility owed to OSHA. It's unfair for Sinclair to be able to rely to rely upon CB and I and CB and I do a breach of the contract by not checking the making certain that the valve met the specifications and having CB and I come back and say, aha, you breached the requirement for a PSSR. Your Honor, I only have a minute, 46 seconds left. I'd like to reserve that time if possible. That's fine. Thank you, counsel. Thank you, Your Honor. All right. If I understand it, we're going to hear from Mr. Merrill next. Is that right? Yes, Your Honor. You may proceed. May it please the court. The court should affirm the district court's judgment to enforce the strong policy recognized in Wyoming of enforcing freedom of contract and to prevent Sinclair from avoiding the effect of that judgment here on appeal, largely by making arguments that were never raised below. I'd like to start with the argument Mr. Breslau made that Sinclair was not able to contest what we refer to as the Eggleston order because of the stay. The stay only applied to motions in limine. And on the face of that order, the court said the parties shall continue to fully brief all motions which have been filed up to this point so that they may be resolved except for motions in limine. That's volume LXII page 16070. So the notion that Sinclair was somehow prevented from objecting to Magistrate Rankin's Eggleston order is simply unsupported by the record. And so the result of that is we have a waiver issue and the court is faced with the prospect of what to do with the admission of Mr. Eggleston that he knew this was a carbon steel valve in 2009. On top of the other evidence that the court noted regarding Sinclair's awareness that this was a carbon steel valve, when coupled with the evidence that Sinclair admits freely to in its opening brief that the information from my clients indicated that this should have been a stainless steel control valve. Was there anything in the proposal that requested a stainless steel valve? Which proposal, Your Honor? Well, let me rephrase that. Was there any requirement that the person that did the FV241 had to do a metallurgy test on it or had to consider the metallurgy effect? I'm not aware of that, and I'll leave that argument to be addressed by Mr. McVeigh, as it would have been his clients to respond to that. My client simply received the control valve from Sinclair as it was an owner-provided piece of material. Well, that was the one that worked or didn't work? Well, the valve that we received from the owner, the replacement valve, FV241, that was the one that didn't work because it was carbon steel, but should have been stainless steel. So, with respect, I think that knowledge back in 2006 and again in 2009 has a fatal effect on the negligence claim in the context of our four-year statute of limitations under Wyoming law. I'd like to move on quickly to address the argument that Judge Matheson raised a moment ago about the indemnity counterclaim and what discovery, if any, Sinclair needed to make. One, this is a matter of pure contract interpretation. I don't see how any discovery would be relevant. But more critically, if Sinclair thought that it needed to conduct discovery, well, it could have simply mentioned that in its opposition to our summary judgment motion, and then the district court would have been faced with that request and likely would have allowed that discovery. So, I think that you have to look at the record and what Sinclair asked for and didn't ask for to answer that question. Counsel, it seems that the cases on whether you needed to replead the counterclaim, that courts have kind of gone in different directions. And my question to you is, you get the amended complaint, and I guess a couple of amended complaints, and you answer those, but you don't replead the counterclaim. And beyond that, you never asked to amend your pleadings to replead the counterclaim. It seems at the very least that the better practice would have been to do that. But why should you get a pass for not doing that? Well, Your Honor, under the applicable case law, courts don't apply. I think the better rule is that the courts don't apply a hard and fast rule. But some do. Some do, and I would argue that that's not the best way to approach it, where there is no rule in the Federal Rules of Civil Procedure that expressly requires the repleading of a counterclaim in response to an amended complaint. What we did do is provide actual notice that we were pursuing that by way of discovery responses after the last amended complaint was served. And that should have and did provide notice to Sinclair that that was an issue. And so I think if that was a legitimate area of misunderstanding, then that should have prompted Sinclair to pick up the phone or file something with the court, which never happened. When you say discovery responses, could you just point to something specific that might be useful to us to know where that is? Yes, Your Honor, and that is in our brief. If you bear with me, I'll find it for you. Oh, that's fine, counsel. If it's in your brief, we'll find it. Okay. Very good. Yeah, it's in the brief, and there's a pin site to the discovery response. I'd like to address in a broader context, as I see I'm running short on time, the indemnity issue is very important because if the court finds that the indemnity ruling should be affirmed, then the rest of this goes away. Because if Sinclair, let's say for the sake of argument that Sinclair convinces the court that the motion to dismiss should be reversed, allowing it to pursue a negligence claim. Well, at the end of the day, what is the legal result if there is a negligence claim against my clients for which they are owed indemnity from Sinclair on a first party basis? So I'd like to focus the court on that issue because it would be, in my view, dispositive of the entire case against my clients. And turning to the merits of the indemnity issues, Sinclair really only advances one argument or advanced, I should say, in its opposition below to the district court, which is that there's these two cross indemnity clauses and they should cancel out and essentially nullify one another. And I believe that's an unpersuasive analytical framework compared to the more thoughtful framework that district court Judge Johnson applied, where he carefully analyzed the entire clause and attempted to harmonize the different provisions. I think that's a more persuasive way to think about it. And so we would submit that Judge Johnson's order is probably the best way to understand how Article 28 works. Briefly on the A and B and matrix issues and why they are covered by the motion to dismiss, my clients briefed that extensively in the motion to dismiss. And I'll say the Joint Appendix BII page 1760 to 62 explaining why Article 1 of the EPC contract provides a performance standard for all my clients and Article 7.2 extends that to subcontractors such as A and B and matrix. Sinclair never opposed it in their opposition. In fact, Sinclair wrote that, quote, Sinclair and the CB&I defendants entered into a contract in their opposition. And that's BII at page 1826. So it's no wonder that Judge Johnson didn't address that issue where Sinclair essentially admitted to the existence of a contract between all three parties. And you can't lull the district court into one understanding and then take a different position on appeal. And I see that my time is up. Thank you, counsel. We're moving now to Mr. Sego. Mr. Sego, thank you, Your Honor. Sorry. Good morning. I represent ACE or Applied Control Equipment, which I will refer to as either applied or ACE throughout this argument. Counsel, could you, it might be helpful if you could just briefly help us understand the working relationship between your client and the IBS defendants. What, how, why, why is there, I mean, you're separately arguing that there seems to be some distinction between ACE and the others, but how, as a practical matter, do they relate to each other? So as a practical matter, Your Honor, I think Mr. McVeigh can address this with more clarity than I can. But I will say this. ACE is what we would refer to as a parts broker. We size the particular valve and we quote a price. We also quote prices for other manufacturers. So the interface that we have with IBS is a relationship. It's a contractual relationship that we also, that they provide the manufacturing and remanufacturing, as the case may be, with regard to control valves. This particular situation, I'd like to point out to the court that ACE also had a history with Sinclair prior to this particular project, which is very important to understand. The valves had issues. So in 2004, there was a purchase by Sinclair of this spot called Hydro Cracker. And that's important to understand, that the Hydro Cracker had some old valves, old control valves that were on a pallet and were just in a heap. And Sinclair wanted to know whether these particular valves could be used, repaired, salvaged, if you will, or whether they needed to be replaced in order to do this new project in Wyoming that was a hydro treater. So the proposal that ACE put together, and understand that this history between ACE and Sinclair, Mr. Walters provided in his declaration that Sinclair never looked to ACE to do engineering, especially with regard to metallurgy or with regard to compatibility of the valve material with their process medium. That was always something done by engineers at Fluor or other places where they would contract it. And Mr. Walters was clear in his declaration that that's the case. They didn't look to ACE to do this, and ACE doesn't do that. ACE is a parts broker. We don't engineer. They don't provide metallurgy, analysis of metallurgy or anything like that. And it's important that the court understand that Sinclair is a sophisticated purchaser in a highly complex and highly regulated industry. They have a non-delegable duty to make sure that their parts that they order from us go into their process media, that they're the correct metallurgy to go in. Now, in nowhere in the proposal that ACE made to Sinclair is there any mention that ACE would do metallurgy or determine compatibility of the metal with the process media that Sinclair was ultimately going to use the valve for. That is something that is completely within the purview of the end user, and it has to be, if you think about it. Because this end user, who's a sophisticated end user and is purchasing the parts, has to know what it's going to use the parts for. ACE, on the other hand, would not necessarily know the specific end use of this product. They might have some inkling, but ultimately it's Sinclair that determines whether this particular part is going to be compatible with the process media that they're working with. For instance, there's no way that ACE would know whether Sinclair was going to do a workaround at this particular location. We don't know whether Sinclair is going to use this valve as an emergency backup or something. You have to keep in mind that this valve was sized by ACE, and then it was quoted. So, once it was sized through the program, it was quoted to Sinclair. That is, we put a quote to them and said, here is the size valve for your purposes, 241, and it was quoted as carbon steel. Carbon steel is the strongest steel there is, and is quoted in 90% of the valves that are done. Now, whether it's compatible with your process media, that's something you have to determine through your engineers, Sinclair. If you don't want a carbon steel valve that we've quoted, don't order it. Don't buy it. That's the issue here, is that we quoted a carbon steel valve, and they didn't change that. They didn't ask for a stainless steel valve to be quoted. If they had, they just had to call ACE and ask for a quote on a stainless steel valve. So, that would have been... One of the questions earlier, I think it was Judge Kelly that asked about... There's really no secret that this was a carbon steel valve. It was quoted as one. It was shipped as one. It was received as one. It was never rejected as a non-conforming good, and it was never sent back or discussed. I mean, the first time that they hear about this is after this explosion, at least from ACE's perspective. I'd also like to just mention that Sinclair is not a passive party here, as Mr. Breslau argues. They are a completely sophisticated operator of a very, very complex and highly regulated industry, and they have a non-delegable duty to know what they're putting into a particular process, media. And as Judge Matheson pointed out, the PSSR as well. I mean, that's something that they have an obligation to do that would have caught any difference in the metallurgy that they needed. But the point being that that's not a task that ACE ever proposed. In reading the proposal, throughout their brief, Sinclair makes the comment that somehow there was this guarantee of performance, but they don't read the entire sentence. What the proposal proposed was that ACE would run the valves through the sizing program, and that would determine the appropriate size for the control valve. Metallurgy is never mentioned within the proposal, nor would it ever be. ACE never did that for Sinclair. They don't do that. They don't have metallurgical engineers on staff to do that. That is not something they do. Mr. Breslau also argued that there was supposed to be some kind of a recommendation by ACE with regard to metallurgy. That, too, is a misinterpretation of the proposal. The only term for best recommendation was that ACE would provide the best recommendation as to whether it will be more cost-effective for you, Sinclair, to go ahead and complete the repair, valves in pretty good shape, rework or replace the trim, valve needs attention, or replace the valve with a newly remanufactured on-core valve, valves in bad shape. That's what ACE was hired to do in this particular instance, is to look at this stack of control valves on pallet and determine whether they could be salvaged. And that was the FB10 you were looking at. Yes, FB10 was in the stack. What happened, Your Honor, was that nearly all of these valves could not be salvaged. They had to be replaced. And so this ultimately ended up being a sale of goods, a number of goods. Each of these valves that were replaced were replaced pursuant to a purchase order that Sinclair sent or accepted from ACE. And each of those purchase orders can be considered a separate contract. But more importantly, each of these purchase orders were for a purchase of a valve, a sale of goods, which would... Dr. Sica, I think my question may go to the products liability claim, but you can correct me if I'm wrong. But it has to do with how we look at the FB241. So it seems that valves are standardized, at least to some degree. But FB241 was also remanufactured based on specifications, as I understand it, that were generated by the First View software program. So my question to you is, to what degree was FB241 more of a custom-made product or as opposed to being more of a standard off-the-shelf product? And how would that relate to the products liability claim? Excellent question, Your Honor. I think my time is about up. I think what I'd like to do is hand that to Mr. McVeigh because he's far more astute. That's fine. I wasn't sure where it should go. I just wanted to get it out there. Appreciate the question. If there's no more questions for me, I'd like to yield my time, the remainder, to Mr. McVeigh. Mr. McVeigh? Turn on your machine. You'll have to take the mute. I am. Okay. Like it or not, you have a pending question. No problem, Your Honor. The FB241 valve body that was sold here was a remanufactured valve. That is a valve that was put out in service. It's an off-the-shelf product. It was returned to our facility in Gonzales, Louisiana, where it was put into a boneyard. And Sinclair, for reasons of economy, likes to purchase repurposed valves. That is, valves that are remanufactured because they're less expensive than newly constructed valves. They initially, in this case, wanted to purchase an internal flange valve. That is a valve that could be bolted into the circuit. So if you needed to remove the valve, service it, and return it, it could be bolted back into the service. When they came to our sales representative, and as Mr. Segoe noted, ACE is a sales representative, an independent sales representative, set their own margins. They're their own entity. They represent other manufacturers. When they came to ACE, they asked for an internal flange valve. At that time, there were no internal flange valves in the boneyard. So what was in the boneyard was a butt-weld-in valve. And I would direct the court's attention to page 15 of our brief, which shows the difference between an internal flange valve and a butt-weld-in flange valve. And so in order to make what Sinclair wanted, and Sinclair was quoted a carbon steel valve, they came back, they asked a very pointed question. Well, if we're going to take this butt-weld-in valve and then weld flanges to it, off-the-shelf carbon steel flanges, what will the dimensions be? And they were given another document, which again said the valve itself and the flanges would be carbon steel. So these are completely off-the-shelf products. They're carbon steel products. They were quoted three times as carbon steel products. The flanges are off-the-shelf flanges that were purchased from a manufacturer in Louisiana called Red Man Manufacturing. And so that's how the valve came to be. Does that answer your honors question? Well, yes, and if you could connect that to the products liability, how does your answer support your position on the dismissal of the products liability claim? The products liability claim should be dismissed under the clear doctrine of McLaughlin. This is the wrong product. There's nothing defective about this product. As Mr. Cornelison, the plaintiff's expert, conceded, the error in this case is that this valve assembly was carbon steel. He also admitted this valve could be properly used in any number of applications. We're not a corrosive environment. We sell valves into sewer systems, water treatment plants, chemical plants, gasification plants. We don't do metallurgy as it relates to the compatibility of the valve body or the valve construction with the processed media. Instrument and valve services with service to refurbished valves. They have no engineers. They do not perform engineering services. They were not asked in this case to perform engineering services, and they never did perform engineering services. They never attempted to perform engineering services. This case falls straight within the doctrine in McLaughlin versus Michelin where this is the wrong product for the application. Under the component supplier doctrine set forth in the restatement section five of restatement third of torts, a component supplier who sells a product which in and of itself is not defective cannot be liable for the manner in which that product is used in the application. This product is not a defective product, and there's no product liability that should attach to this product. It simply was the wrong product for the application, and under the component supplier doctrine, there should be no liability that attaches. Furthermore, with respect to, I think, Judge Kelly's question, it's really interesting to note that not only were there three quotations to Sinclair for this product indicating they were carbon steel, that when the valve came to Sinclair, it was noted that the construction of the valve assembly was carbon steel on the actuator tag, both flanges of the valve, the valve body, and the valve bonnet. And the actuator tag would not be something that would ever be covered by insulation. We also know that in 2009, there was a fire, and this valve was removed from and returned to service by Sinclair. So it's out, there's no insulation on it. All of these notations on the valve showing that the valve is carbon steel would be readily observed, readily detected, and Mr. Eggleston admitted that he knew the valve was carbon steel. Under the firm waiver rule, Sinclair did not appeal Judge Rankin's striking of the after-the-fact attempt by Sinclair's counsel to rewrite Mr. Eggleston's deposition, and it's confirmed that by no later than 2009, notwithstanding everything else that happened in 2005 and 2006, that Sinclair knew that this valve was carbon steel. So that really addresses that issue, Your Honor. With respect to Mr. Breslau's attempt to avoid the implications of the firm waiver rule in saying he was prohibited from doing so by the stay, we know that's not true. And how do we know that's not true? Well, Mr. Merrill read the language of the stay. But the other thing we know is that following the entry of that stay order, which only stayed filings of motions in limine, we, the INVS defendants, filed a motion for reconsideration with respect to the testimony of Mr. Cornelison and Mr. Finacaro, and that was filed on 9-21-2018, well after the stay. And when Sinclair responded to that motion, they did not raise an argument at that time that we were prohibited from filing that motion for reconsideration because of the stay. They didn't raise it. They didn't raise that until we raised the firm waiver rule on appeal. And moreover, when Judge Johnson granted that order, you know, subsequently granted that order, he did not say that that order was not timely or was prohibited because of the stay. That is an after-the-fact, lawyer-manufactured argument that Mr. Breslau is attempting to use to excuse the fact that for tactical reasons, they did not appeal Judge Rankin's ruling. We'll never know exactly what those tactical reasons were. But it could be that they did not want the district court judge to see the wholesale changes that they had attempted to make to Mr. Eggleston's deposition, a person who they had represented for more than a year prior to his first deposition. And in that, I would prove that the fact they represented Mr. Eggleston for more than a year prior to his first deposition, that's in the joint appendix at page 6640. Frankly, Your Honors, this case is very simple. It's a case about duty. Duty is a question of law for the court to decide. And my clients had no duty with respect to metallurgy. With respect to the strict liability claim, it's the wrong product, and the result there is dictated by the McLaughlin decision. With respect to the negligence claim, we never undertook to perform any metallurgical analysis. We don't perform metallurgical analysis, and we did not do that. And with respect to the failure to warn claim, Your Honor, it's clear that with respect to a wrong product that a component supplier has no duty to warn that the product that they have been contractually obligated to sell. And we were never told anything about this product other than it should be carbon steel. Contractually obligated to sell was, in fact, the wrong product for their application. In closing, I would just say that I think Judge Johnson indicated there may be an issue as to whether ACE was acting as our agent in conducting this. But it's important to note Sinclair never sued any of my clients for breach of contract as a disclosed principle under an agency relationship. Not only did they not sue them, they admitted in response to a request for admission on three occasions that they had no contract with INVS, no contract with Emerson, and no contract with Fisher. Thank you. I think I'm out of time, Your Honor. I will answer any additional questions you might have if you would like. Thank you. Any questions from the panel? All right. Mr. Breslau, you have some rebuttal time. You'll have to unmute the mic. There you go. I appreciate that. I do have limited rebuttal time. With respect to ACE's argument, Your Honor, I encourage the court to look at the contract. They indicate they have extensive repair experience and provide engineering support. They indicated that they would provide guaranteed performance in the application specified, which are the process conditions that were used. ACE chose the metallurgy on this valve. They entered the information into the Fisher First View program for carbon steel and supplied a carbon steel valve to Sinclair. Sinclair relied upon their expertise. With respect to the product liability argument, Your Honor, what you didn't hear is that both ACE and IVS, pursuant to this agreement, touted their combined expertise with respect to these valves. IVS noted that FV10 was a stainless steel valve and also noted that FV241 was to be a stainless steel valve. And somehow that didn't happen. Where was that in the contract papers? The contract papers on a proposal, an order for ACE repair, and a quote to manufacture. I see nothing. Judge Kelly, it's in the proposal. And the proposal says nothing about stainless steel. It indicates that they will provide a remanufactured valve. And how can you provide a remanufactured valve if you don't choose metallurgy? It's impossible. And it's undisputed they chose the metallurgy and entered that into the Fisher First View program, which spit out a specification sheet. And if they were going to take the position that they were not choosing metallurgy, they shouldn't have chosen or they should have told us that they're guessing with respect to carbon steel. These are all issues of fact, Your Honor, that a jury should determine. Counselor, you're out of time. If you'd just like to sum up briefly, we'll do that and then we'll conclude. Okay. Thank you, Your Honor. Again, with respect to the product defect, statement third indicates that if the product is defective in design, when the foreseeable risks of harm could have been avoided or reduced by the adoption of an alternative design. Here, the foreseeable risk was high temperature hydrogen attack. The alternative design would have been stainless steel. Your Honor, this case has multiple issues of fact that needed to be decided by the jury, which were taken away from the jury by the court. And we would request that this matter be reversed and remanded so these matters can be determined by a jury. Thank you, sir. Thank you, counsel. Thank you to all counsel this morning. We've covered a lot of ground and the panel appreciates your arguments. The case will be submitted. Counsel are excused.